D. GILL SPERLEIN (SBN: 172887)
gill@sperleinlaw.com
LAW OFFICE OF D. GILL SPERLEIN
345 Grove Street
San Francisco, CA 94102
Telephone: (415) 404-6615
Facsimile: (415) 404-6616

HARMEET K. DHILLON (SBN: 207873)
harmeet@dhillonlaw.com
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, California 94108
Telephone: (415) 433-1700
Facsimile: (415) 520-6593

*Attorneys for Eva Knott*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| EVA KNOTT,<br><br>                    **Plaintiff,**<br><br>        v.<br><br>THE CITY OF SAN DIEGO;<br>POLICE CHIEF DAVID NISLEIT,<br>in his representative capacity as<br>Chief of Police; and LIEUTENANT<br>ADAM SHARKI, in his<br>representative capacity as SDPD<br>Public Information Officer,<br><br>                    **Defendants.** | Case No.: **'24CV0855 BAS DDL**<br><br>**COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELEIF (42 U.S.C. § 1983 & 1988)**<br><br>**JURY DEMANDED** |

1

# INTRODUCTION

*A journalist enjoys a privileged position. In exchange for not being able to participate in the rough-and-tumble issues of a community, we are given license to observe it all, based on the understanding that we'll tell everyone what happens fairly and squarely.*

American Journalist Bill Kurtis.

1.     While it is true that being a journalist is an honor, news gathering is also a core constitutional right subject to First Amendment and Fourteenth Amendment protections.

2.     When government officials grant special access to the media through the issuance of press passes, the First Amendment requires that those officials do not favor certain journalists over others; the Fourteenth Amendment requires that those officials provide due process when issuing, denying, or revoking press passes.

3.     California law also protects press access and specifically guarantees the media the right to cross police lines at demonstrations, marches, protests, rallies, and emergency scenes, even when public officials close those areas to the general public.

4.     San Diego Police Department (SDPD) eschews these constitutional and legislative constraints. According to SDPD procedure, possession of an SDPD-issued media identification card (press pass) is a privilege. By framing the possession of a press pass as a privilege, SDPD allows itself to determine who is worthy of the privilege and who is not. And, *ipso facto*, which viewpoints are worthy, and which are not.

5.     Plaintiff, a reporter for the San Diego Reporter and the Millennial Post, held an SDPD press pass for approximately fifteen years. For most of that time SDPD allowed her to use her pen name, Eva Knott, on the press pass badge, though they internally maintained a copy of her fingerprints and a record of her legal name.

6.      On August 8, 2022, Plaintiff's competitor, Will Carless, a national correspondent for USA Today, confronted Plaintiff at the courthouse where both reporters were covering the criminal trial of eleven Antifa members and grilled her about her name. Unsatisfied with Plaintiff's responses, Carless complained to the San Diego Police Department through its Media Department.

7.      In response to this prodding by Plaintiff's competitor, SDPD took measures to revoke Plaintiff's press pass.

8.      Although SDPD has some written procedures regulating the issuance and revocation press passes, they failed to follow those procedures. When Plaintiff inquired about appeal procedures, an unidentified SDPD representative informed her that SDPD had a formal appeals process, but they would only explain the process in detail if Plaintiff first turned in her press pass.

9.      When Plaintiff recently applied to renew her card, SDPD denied her application. Although SDPD claimed it denied her renewal application because she did not demonstrate a need to regularly cross police or fire lines, the true reason for the denial was to satisfy the demands of the USA Today reporter who first complained about Plaintiff's use of a pen name.

10.     Failing to follow their own limited written procedures, SDPD did not allow Plaintiff to appeal the denial of her renewal application. They offered no explanation as to what had changed since last renewing her card, nor did they offer any guidance as to how she could establish her continued need for a card.

11.     SDPD's unjust treatment of Plaintiff directed a spotlight on the constitutional infirmaries that riddle SDPD's current limited written procedures.

12.     Plaintiff now seeks to redress the unjust and unconstitutional treatment she received and to challenge the facial deficiencies in the SDPD's press pass procedures so that other similarly situated journalist will not suffer the same fate.

**JURISDICTION AND VENUE**

13.     This case arises under the United States Constitution and the laws of the United States and presents a federal question within this Court's jurisdiction under Article III of the Constitution and 28 U.S.C. § 1331 and 28 U.S.C. § 1343(3). It seeks remedies under 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. §§ 1983 and 1988, and Fed. R. Civ. P. 65. This Court has authority to award attorneys' fees pursuant to 42 U.S.C. § 1988. Each of the acts alleged herein were done by Defendants, their officers, agents, and employees, under color and pretense of the statutes, ordinances, regulations, customs, and usages of the City of San Diego and the San Diego Police Department.

14.     Personal jurisdiction is proper over Defendants because the City of San Diego is a chartered city within this District, the other Defendants reside or work in the City of San Diego, and the wrongful activity at issue occurred in this District.

15.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claim occurred in this district.

**PARTIES**

16.     Eva Knott is Plaintiff's *nom de plume*, which she uses in conjunction with her news reporting. With this Complaint, Plaintiff concurrently files a motion for leave to proceed in this litigation using her pseudonym. Plaintiff is a news reporter who covers news events within the City of San Diego and San Diego County.

17.     The City of San Diego is an incorporated city situated within San Diego County, California. San Diego regulates, controls, and is responsible for the actions of the San Diego Police Department.

18.     David Nisleit is the Chief of Police of the SDPD. At all times relevant he was acting within the scope of his duties under color of state law.

19.     Lieutenant Adam Sharki is the public information officer for the SDPD. At all times relevant he was acting within the scope of his duties under color of state law.

## FACTS COMMON TO ALL CLAIMS

20.     The City of San Diego, through its Police Department, issues media identification cards—commonly referred to as press passes—to news media representatives.

21.     An SDPD-issued press pass allows news media representatives to cross police and fire lines. Blue parking placards, which are issued along with press passes, allow the holder to park in yellow zones, white zones, time zones, and parking meters while engaged in the course of their duties.

22.     In order to obtain a press pass and parking placard, news media representatives must submit an application to the SDPD. The City of San Diego provides two different forms to use when applying for a press pass. One form is used by media representatives who work exclusively for one news organization; the other is for use by independent media representatives who work for more than one news organization.

23.     SDPD publishes its current procedures relating the application for and of issuance of press passes in SDPD Procedure 1.31.

24.     SDPD publishes its current procedures for media relations at critical incidents in Department Procedure 8.09 which recognizes that such incidents are, "of great interest to the public and the news media." DP 8.09 (III). Officers at major critical scenes identify areas that are to be accessible and restricted to media personnel. *Id.* at (IV)(C)(3). Procedures instruct the public information officer to conduct media briefings, to remain available to media personnel, and to monitor the activities of media personnel. *Id.* at IV(C)(4). The procedure recognizes that, "[d]isaster and accident scenes may be closed to the public pursuant to 409.5 PC; however, news media representatives are exempt from this restriction." *Id.* at (V)(B).

25.     Since 1957, California law has guaranteed access to emergency scenes by "a duly authorized representative of a news service, newspaper, or radio or television station or network." Cal. P. Code § 409.5 (d)(1).

26.     On January 1, 2022, a new California statute went into effect extending the media's right of access to include law enforcement closures to areas immediately surrounding, "a demonstration, march, protest, or rally where individuals are engaged in activity that is protected pursuant to the First Amendment to the United States Constitution or Article I of the California Constitution." Cal. P. Code § 409.7 (a)(1).

27.     SDPD recognizes and accepts press passes from other bona fide law enforcement agencies. Similarly, many other jurisdictions in California recognize and honor SDPD-issued press passes.

28.     Plaintiff is a free-lance reporter and photographer. She regularly writes for the San Diego Reader, a local news agency which publishes both online and in a weekly print edition. Plaintiff also reports for the Millennium Post, which publishes online only. Plaintiff primarily covers crime and the courts.

29.     Plaintiff first applied to the SDPD for a media identification card in or around 2008, using her married name on her application. SDPD approved the application and issued Plaintiff a press pass.

30.     In 2008 or 2009, Plaintiff received a handwritten letter sent to her home address from a convicted felon whose trial she had covered in her reporting. She and her husband found this deeply concerning. Plaintiff discussed the situation with her husband and her editor, and they agreed she would begin using a pen name. Since then, Plaintiff has been known professionally as Eva Knott. Now a widow, Plaintiff continues to use her married name in her social and private life.

31.     Since she adopted her pen name, Plaintiff has applied to renew her press pass every two years using the name Eva Knott. And, every two years SDPD approved

her application. As required under SDPD procedures each time she renewed her press pass, Plaintiff picked up her press pass in person so that SDPD staff could check her identification card and take her photograph for the new Press Pass. They also took her fingerprints. SDPD has at all times had full knowledge that Eva Knott is Plaintiff's pseudonym.

32.     During the last few years, Plaintiff has extensively covered criminal trials relating to an Antifa riot that took place in Pacific Beach on January 9, 2021.

33.     On August 8, 2022, Plaintiff's competitor, Will Carless, a national correspondent for USA Today, confronted Plaintiff at the courthouse where they were both covering the Antifa trial. He got very close to Plaintiff and put his phone/camera near her face, presumably to record the conversation.  He demanded to know her name and where she lived. Plaintiff responded to some but not all of Carless' questions, despite his being rude and talking over her answers.

34.     Carless was undeterred. He complained to the San Diego Police Department through its Media Department demanding to know if Plaintiff had provided proof of identification to SDPD when applying for a press pass and whether Plaintiff had violated any laws by using a pseudonym on her press pass badge.

35.     Responding to this pressure from Plaintiff's competitor, SDPD took measures to revoke Plaintiff's press pass even though it had knowingly allowed Plaintiff to use her pseudonym for many years, and despite the fact that California common law allows individuals to informally change their names, and the First Amendment protects anonymous speech.

36.     In October 2022, Plaintiff received an email purportedly from the SDPD stating that her media identification card had been revoked because it did not reflect her legal name. At the time, Plaintiff was not aware of Carless's underhanded and anti-competitive tactics.

37.     Plaintiff questioned the authenticity of the SDPD email because: a) it did not make sense given that SDPD had routinely approved her press pass applications for many years, with full knowledge that Eva Knott is a pen name; b) the email had no signature block, while previous communications she received from SPDP always contained a block containing the name, rank or title, and contact information of the SDPD representative sending the communication; c) regulations require notices of revocations to be sent to the business address of the media card holder and she had not received any such notification; and d) she knew from her reporting that Antifa, routinely doxes individuals and spoofs e-mails.

38.     Later, her suspicion was further heightened when one of the Antifa defendants filed a motion to exclude her from the courtroom and urged the court to sanction Plaintiff for using her pen name on media request forms she filed with the court. The motion included allegations that SDPD had revoked her media card but did not explain the basis for, or the source of, this allegation. The court denied the motion.

39.     Only later did Plaintiff learn that Carless had instigated the attacks on the validity of her press credentials.

40.     On September 21, 2023, Plaintiff submitted an application to renew her press pass for another two years. In a cover letter accompanying the application, Plaintiff explained through her lawyer:

> In 2009 or 2010, after [Knott] received a handwritten letter sent to her home address from a convicted felon whose trial she had reported on, she began writing under the nom de plume Eva Knott. She made this change as a safety measure because she regularly reported on crime and the courts and other criminal defendants had attempted to intimidate her. […] When she renewed her Media Pass, she asked that it be issued in the name of Eva Knott and SDPD granted her request. She has renewed the Media Pass every two years, each time SDPD photographed and fingerprinted her.

41.    On November 9, 2023, Defendant Lt. Adam Sharki informed Plaintiff through her counsel that her, "appeal is respectfully declined" because her application did not, "demonstrate a need to cross police and/or fire lines on a regular basis." The email from Lt. Sharki made it clear that the application she submitted would receive no further consideration, writing that Plaintiff could submit a new application if she desired. Lt. Sharki made no reference to an earlier revocation or the use of her pen name.

42.    In a November 16, 2023 letter Plaintiff's counsel requested an explanation as to why Lt. Sharki's email referred to an appeal, since neither she nor her counsel were aware of any initial denial of the renewal application and therefore had not filed an appeal. The letter from Plaintiff's attorney requested clarification and instructed SDPD that if the denial was not final, the SDPD should treat the letter as a request for an appeal.

43.    SDPD did not respond further, thus Plaintiff was denied an opportunity to further adjudicate the denial of her renewal application.

44.    On a regular basis, Plaintiff reports from courtrooms on criminal hearings, where court staff rely on press passes to identify individuals in the courtroom who may be authorized to photograph or record the proceedings. Visible press passes also alert lawyers, parties, jurors, and the general public that individuals are members of the press.

45.    Although, most of her news gathering occurs in the courtroom, Plaintiff intends and desires to report from behind police lines particularly police lines formed in conjunction with demonstrations, marches, and protests in which members of Antifa may be present. More specifically, she intends to cover any protests that take place after sentencing is announced for some of the Antifa criminal defendants on June 12 and 28,

2024. Plaintiff also intends to cover any public demonstrations around the upcoming presidential elections, especially if those demonstrations involve Antifa.

46.     Because news by its very nature is ephemeral and unpredictable, Plaintiff cannot say when she will next need to cross police or fire lines or park near an active news event in order to advance her reporting.

## FIRST CAUSE OF ACTION
### (42 U.S.C. §1983)
### *Violation of the Fourteenth Amendment - Procedural Due Process*
### Facial Violations Against Defendant City of San Diego

47.     Plaintiff repeats and incorporates by reference all preceding paragraphs as if fully restated herein.

48.     Members of the media have a First Amendment liberty interest in accessing areas the government has opened to members of the press for the purpose of news gathering.

49.     Under California law, bona fide media representatives also have a liberty interest in accessing areas closed by law enforcement officials due to public health and safety issues or closures relating to demonstrations, marches, protests, or rallies.

50.     The Fourteenth Amendment requires procedural due process before government officials deprive a citizen of liberty or property interests.

51.     At its core, procedural due process requires notice and an opportunity to be heard. Defendants' policies, customs, and usage, as set forth in Procedure 1.31, provides neither.

52.     Based on her experience with prior applications over the years, Plaintiff is informed and believes and based thereon alleges that Procedure 1.31 contains the only written procedures governing the issuance and revocation of SDPD media identification cards.

53.     SDPD Procedure 1.31 fails to comport with Fourteenth Amendment procedural due process requirements in that it does not provide for any hearing before denying an application for an SDPD media identification card or revoking a previously issued card.

54.     Procedure 1.31 does not properly notify prospective applicants what is required in order to be issued a media identification card. Specifically, although an applicant "must demonstrate a need to cross police and/or fire lines on a regular basis," neither Procedure 1.31, nor the application explain how an applicant can demonstrate such need.

55.     The application for an SDPD media identification card consists of only the following fields:

    a.  The applicant's full name, residence address, home phone number, date of birth, and social security number;

    b.  The name and business address of the news organization that the applicant represents;

    c.  The applicant's job title, date of hire, and business phone number;

    d.  The signature of the applicant and the signature of the owner, managing editor, or other supervisor of newsgathering activities for the news organization; and,

    e.  In addition to containing information described above, the application for an independent or freelancer will include the applicant's business phone number and the phone numbers of individuals/agencies to whom the applicant regularly sells his or her work.

56.     On the application, a text box over the signature line reads:

> I understand that possession of a San Diego Police Department Media Identification Card is a privilege granted by the Chief of Police to those who cover spot news on a regular basis. The Chief of Police reserves the right to deny or revoke a card, according to the guidelines established in San Diego Department Procedure 1.31.

57.     The form does not ask for information demonstrating, "a need to cross police and/or fire lines on a regular basis," nor does the form provide a field or other space in which an applicant is able to provide such information. Neither SDPD Procedure 1.31, nor the application forms provide any information about how an applicant can demonstrate, "a need to cross police and/or fire lines on a regular basis."

58.     Neither SDPD Procedure 1.31, nor the application forms provide a definition of "regular basis." Nor do either identify objective criteria to be used in determining if an applicant meets this requirement.

59.     Based on her experience submitting prior applications over the years, Plaintiff is informed and believes and based thereon alleges that the City of San Diego and SDPD have no written guidelines for determining what criteria apply in determining what constitutes the demonstration of a need to cross police and/or fire lines on a regular basis as required for the issuance of a media identification card.

60.     The deficiencies and inconsistencies that appear within the four corners of SDPD Procedure 1.31 invite mischief and therefore should be found to facially violate procedural due process requirements of the Fourteenth Amendment.

61.     Pursuant to Title 42 United States Code § 1983 and the Due Process Clause of the Fourteenth Amendment, Plaintiff is entitled to a declaration that Procedure 1.31 violates due process on its face.

62.      Pursuant to Title 42 United States Code § 1983 and the Due Process Clause of the Fourteenth Amendment, Plaintiff is entitled to preliminary and permanent injunctive relief restraining Defendant City of San Diego from denying media identification cards to otherwise qualified applicants on the basis of an applicant's failure to demonstrate a need to regularly cross police or fire lines.

63.     Pursuant to Title 42 United States Code § 1983 and the Due Process Clause of the Fourteenth Amendment, Plaintiff is entitled to preliminary and permanent

injunctive relief restraining Defendant City of San Diego from denying or revoking media identification cards without providing notice of the reasons for the denial or revocation and a hearing.

64.     Plaintiff has been harmed by Defendants' unconstitutional actions and is entitled to nominal, compensatory, and punitive damages.

## SECOND CAUSE OF ACTION

### (42 U.S.C. §1983)

### *Violation of the Fourteenth Amendment - Procedural Due Process*

### As Applied Violations Against All Defendants

65.     Plaintiff repeats and incorporates by reference all preceding paragraphs as if fully restated herein.

66.     At all times material hereto, Plaintiff was and is a bona fide media representative, who engages in and intends to continue engaging in news gathering and reporting within the City of San Diego and San Diego County.

67.     Plaintiff submitted an application to renew her SDPD media identification card on September 21, 2023. Having not received any communication in response, her counsel made an inquiry via email on October 2, 2023. Three days later, Lt. Sharki responded by email that the application was under review. The next correspondence from Lt. Sharki stated, "[y]our application does not demonstrate…[a need to cross police and/or fire lines on a regular basis] and therefore, you have not met the required qualifications to be issued an SDPD Media Credential."

68.     Lt. Sharki stated that Plaintiff could submit a new application, but he did not indicate that the denial could be appealed.

69.     Lt. Sharki did not respond to a request for further information about an appeal process.

70.     Plaintiff has a First Amendment liberty interest in accessing areas the government has opened to members of the press for the purpose of news gathering.

71.     Under California law, Plaintiff, as a bona fide news media representative, also has a liberty interest in accessing areas closed by law enforcement officials due to public health and safety issues or closures relating to demonstrations, marches, protests, or rallies.

72.     Defendants have denied these liberty interests to Plaintiff by attempting to revoke her press pass and then denying her application to renew it.

73.     When government officials deny liberty interests, the Fourteenth Amendment requires procedural due process, which at its core requires notice and an opportunity to be heard. Defendants provided neither.

74.     Based on her experience with prior applications over the years, Plaintiff is informed and believes and based thereon alleges that SDPD has no written procedures in place for evaluating media identification card applications other than those found within Procedure 1.31 and on the two standard media card application forms.

75.     Based on her experience with prior applications over the years, Plaintiff is informed and believes and based thereon alleges that Defendants denied Plaintiff's application to renew her media identification card based solely on the application she submitted.

76.     Alternatively, Defendants denied Plaintiff's application to renew her media identification card based on unwritten or unpublished criteria.

77.     The sole basis SDPD provided for its denial is that Plaintiff's application failed to demonstrate "a need to cross police and/or fire lines on a regular basis."

78.     The application for an SDPD media identification card consists of only the following fields:

      a. The applicant's full name, residence address, home phone number, date of birth, and social security number;

    b.  The name and business address of the news organization that the applicant represents;

    c.  The applicant's job title, date of hire, and business phone number;

    d.  The signature of the applicant and the signature of the owner, managing editor, or other supervisor of newsgathering activities for the news organization; and,

    e.  In addition to containing information described above, the application for an independent or freelancer will include the applicant's business phone number and the phone numbers of individuals/agencies to whom the applicant regularly sells his or her work.

79.    On the application, a text box over the signature line reads:

> I understand that possession of a San Diego Police Department Media Identification Card is a privilege granted by the Chief of Police to those who cover spot news on a regular basis. The Chief of Police reserves the right to deny or revoke a card, according to the guidelines established in San Diego Department Procedure 1.31.

80.    The form does not ask for information demonstrating, "a need to cross police and/or fire lines on a regular basis," nor does the form provide a field or other space in which an applicant is able to provide such information. Neither SDPD Procedure 1.31, nor the application forms provide any information about how an applicant can demonstrate, "a need to cross police and/or fire lines on a regular basis."

81.    Neither SDPD Procedure 1.31, nor the application forms provide a definition of "regular basis." Nor do either identify objective criteria to be used in determining if an applicant meets this requirement.

82.    Defendants denied Ms. Plaintiff's application for a media identification card without following the procedures set forth in SDPD Procedure 1.31. Although SDPD Procedure 1.31 includes an appeal provision, Defendants deprived Plaintiff of any opportunity to appeal.

83.     Defendants, acting under color of municipal law, have deprived and threaten to continue to deprive Plaintiff of her liberty and property interest in a media identification card without providing procedural due process required by the Fourteenth Amendment to the United States Constitution.

84.     Plaintiff is entitled to preliminary and permanent injunctive relief restraining Defendants from denying Plaintiff a press pass and declaratory relief that Defendants actions violated Plaintiff's due process pursuant to Title 42 United States Code § 1983.

85.     Plaintiff has been harmed by Defendants' unconstitutional actions and is entitled to nominal, compensatory, and punitive damages.

## THIRD CAUSE OF ACTION

### (42 U.S.C. §1983)

*Violation of the First Amendment of the United States Constitution*

**(prior restraint, unconstitutional grant of unbridled discretion, overbreadth, vagueness, public forum doctrine)**

**Facial Challenge Against Defendant City of San Diego**

86.     Plaintiff repeats and incorporates by reference all preceding paragraphs as if fully restated herein.

87.     Pursuant to state law, local ordinance, and SDPD policy, SDPD allows members of the media to access areas that public officials have temporarily closed to the general public for health and safety reasons due to a calamity or for crowd control at demonstrations, marches, protests, or rallies.

88.     SDPD relies upon the presentation of a media identification card to determine which members of the media are allowed to cross police or fire lines or attend press briefings. Press parking placards allow members of the media to park in areas that are either specifically designated for the press or which are available to the

general population subject to restrictions that do not apply to the press when covering news events.

89.     Public officials and law enforcement agencies in other jurisdictions also rely on SDPD-issued media identification cards to determine which reporters can attend press briefings, cross police or fire lines, or park in media designated areas.

90.     SDPD 1.31, which governs the application for, issuance of, and revocation of media identification cards is a government regulation directed at First Amendment protected activity; namely, news gathering.

91.     A denial of an application for a media identification card and accompanying parking placard, restricts a reporter's ability to engage in news gathering functions protected by the First Amendment by limiting their access to emergency scenes. Thus, the requirement that members of the media obtain a media identification card in order to cross police and fire lines is a form of prior restraint and is therefore presumed unconstitutional.

92.     Regulations requiring government approval before engaging in First Amendment Protected activity must include a requirement that the governing authority issue a decision on applications within a brief, specified, and reasonably prompt period of time.

93.     Although SDPD Policy 1.31 requires SDPD to notify an applicant of a denial of a press pass application within ten days of the decision, it places no limits on the amount of time SDPD has to process the application and decide to grant or deny the media identification card.

94.     The First Amendment also dictates that when permission from government officials is required prior to engaging in First Amendment protected activities by requiring a license, permit—or, as in this case, an identification card—the regulations for ruling on an application must contain narrow, objective, and definite standards.

95.     Various procedures Defendants use to determine who will receive an SDPD media identification card confer unbridled discretion with the chief of police or his designees and are therefore constitutionally infirm.

96.     Specifically, the requirement that a media representative must demonstrate "a need to cross police and/or fire lines on a regular basis," with no objective criteria for determining "a need" or "regular basis" invites content-based, viewpoint-based, or speaker-based discrimination by failing to place meaningful restrictions on SDPD's discretion to deny applications for media identification cards and parking placards. The inherent subjectivity of the criterion allows SDPD to use it as pretext for denying an application. Accordingly, the requirement that media representatives must demonstrate "a need to cross police and/or fire lines on a regular basis" is unconstitutional on its face.

97.     SDPD Procedure 1.31 (IV)(D) grants the Chief of Police unfettered discretion to deny an application because it employs the nonimperative "may" instead of the constitutionally required imperative "shall." By using "may," the procedure allows the Police Chief to deny a media identification card and corresponding vehicle identification placard to media representatives who report disapprovingly of the San Diego Police Department and grant applications for media representatives whose reporting reflects favorably upon the Department.

98.     SDPD Procedure 1.31 (IV)(F)(i) allows SDPD to deny or revoke a media card to a journalist who has "[d]ocumented behavior that would bring the Department or press pass holder into disrepute." This provision is entirely subjective and confers unbridled discretion with the department to deny or revoke a media identification card and is therefore unconstitutional.

99.     SDPD Procedure 1.31 (VII)(A) and (B) grant the Chief of Police or his designee unfettered discretion to revoke a media identification card and corresponding

parking placard because the procedures employ the nonimperative "may" instead of the constitutionally required imperative "shall." By using "may," the procedure allows the Police Chief or his designee to revoke a media identification card and corresponding vehicle identification placard from media representatives who report disapprovingly of the San Diego Police Department while refraining from revoking those of media representatives whose reporting reflects favorably upon the Department.

100.   Similarly, SFPD Procedure 1.31's appeal provision confers too much discretion in the police chief or his designee. Because there are no written procedures regulating how an appeal from the denial of a press pass application will be conducted, the chief of police is free to create procedures after an application is denied. Procedure 1.31 fails to address any of the following: 1) who will adjudicate the appeal; 2) who will select the adjudicator; 3) how the adjudicator will be selected; 4) whether the official adjudicating an appeal can consider any documents or evidence besides the originally filed application; 5) if evidence is allowed, what type of evidence is permissible; and 6) whether the adjudicator will apply substantial evidence, abuse of discretion, de novo, or some other standard of review.

101.   The ability to select the procedures will mean the difference between the applicant receiving a fair adjudication or having a government official rubber stamp the original denial– potentially the same official who denied the application in the first place. The lack of procedural standards is no less critical than the lack of objective substantive standards and invites the same mischief.

102.   The procedure requiring media identification card applicants to demonstrate "a need to cross police and/or fire lines on a regular basis" is impermissibly and substantially overbroad judged in relation to any legitimate sweep.

103.   The procedure requiring media identification card applicants to demonstrate "a need to cross police and/or fire lines on a regular basis" contains terms

COMPLAINT

and phrases that are impermissibly vague and ambiguous, specifically the terms, "a need" and "regular basis." Thus, the procedure fails constitutional muster due to vagueness.

104.   The locations to which a media identification card allows access to media representatives are either traditional public fora or designated public fora.

105.   The procedure requiring media identification card applicants to demonstrate "a need to cross police and/or fire lines on a regular basis" fails to further any substantial governmental interest.

106.   The procedure requiring media identification card applicants to demonstrate "a need to cross police and/or fire lines on a regular basis" is not sufficiently tailored.

107.   To the extent Defendants can identify a government interest in limiting access by bona fide media representatives to emergency scenes, such governmental interest can be achieved by means that are less restrictive than denying press passes to bona fide media representatives unless they demonstrate a need to cross police and/or fire lines on a regular basis.

108.   The procedure requiring media identification card applicants to demonstrate "a need to cross police and/or fire lines on a regular basis" does not leave open ample alternatives for news gathering activates protected by the First Amendment.

109.   The constitutional deficiencies and inconsistencies that appear on the face of SDPD Procedure 1.31 violate the First Amendment of the United States Constitution.

110.   Specifically,

      a.  SDPD Procedure 1.31 does not require the Police Chief or his designee to process applications for media identification cards within a brief, specified, and reasonably prompt period of time;

b. §(V)(B) which requires that an "applicant must demonstrate a need to cross police and/or fire lines on a regular basis," sections 1.31 (IV)(D), (VII)(A), and (VII)(B), which use the nonimperative "may," and (IV)(F)(i) which allows SDPD to deny or revoke a card to a journalist who has documented behavior that would bring the Department or the pass holder into disrepute, confer unbridled discretion with the official processing applications;

c. The appeal provision set forth at § (VII)(C) grant unbridled discretion with public officials because the procedure does not provide any guidelines or procedures for processing the appeal including, what official will hear the appeal, what evidence is permitted, or what standard of review will be applied;

d. §§ (IV)(F)(i) and (V)(B) are substantially overbroad;

e. §§ (IV)(F)(i) and (V)(B) are unconstitutionally vague; and

f. §§ (IV)(F)(i) and (V)(B) are not narrowly tailored to serve a substantial governmental interest, and do not leave open ample alternatives for communication.

111.   Pursuant to Title 42 United States Code § 1983 and the First Amendment, Plaintiff is entitled to a declaration that the provisions found within Procedure 1.31 described above violate the First Amendment on their face.

112.   Pursuant to Title 42 United States Code § 1983 and First Amendment, Plaintiff is entitled to preliminary and permanent injunctive relief restraining Defendant City of San Diego from enforcing the unconstitutional provisions of SDPD Procedure 1.31 as described above.

113.   Plaintiff has been harmed by Defendants' unconstitutional actions and is entitled to nominal, compensatory, and punitive damages.

## FOURTH CAUSE OF ACTION

### (42 U.S.C. §1983)

### *Violation of the First Amendment of the United States Constitution*

### (prior restraint, unconstitutional grant of unbridled discretion, vagueness, public forum doctrine, retaliation, viewpoint discrimination)

### As Applied Challenge Against All Defendants

114.   Plaintiff repeats and incorporates by reference all preceding paragraphs as if fully restated herein.

115.   Defendant's denial of Plaintiff's media identification card application constitutes a violation of her First Amendment rights.

116.   Creating a licensing scheme that requires government authorization prior to engaging in speech without requiring the government to process applications withing a brief, specified, and reasonably prompt period of time creates a form of content-based discrimination because the absence of a deadline allows government officials can pocket veto disfavored speech.

117.   Defendants failed to process Plaintiff's media identification card application within a brief, specified, and reasonably prompt period of time.

118.   To the extent SDPD Procedure 1.31 sets a time frame in which media identification cards must be processed, Defendants failed to abide by such requirements.

119.   Defendants denied Plaintiff's First Amendment rights by denying her application to renew her media identification card based on terms that were vague including the phrase "need to cross police and fire lines on a regular basis."

120.   Defendants failed to follow its own written procedures with regard to processing Plaintiff's media identification card application in that they failed to allow Plaintiff to appeal the denial of her application for a media identification card.

121.   Defendants retaliated against Plaintiff. Plaintiff was engaged in the First Amendment protected activity of news gathering. Defendants took adverse action

against Plaintiff by attempting to revoke her then active press pass and then denying her renewal application for a press pass. Defendants' actions deterred Plaintiff from engaging in protected activity because she will not be permitted to cross police or fire lines without a press pass. Defendants took the adverse action against Plaintiff, in reaction to pressure from a journalist working for a newspaper with national readership and they preferred to stay in the good graces of that journalist in order to better assure positive coverage of the SDPD in USA Today.

122.   Defendants engaged in viewpoint discrimination against Plaintiff. Will Carless reports on extremism and emerging issues from left-leaning orthodoxy, only challenging rightwing extremism. Plaintiff challenges this orthodoxy and writes from the perspective that extremists on both the right and left ends of the political spectrum should be treated equally under the law. Carless, Plaintiff's competitor, attempted to deter Plaintiff from reporting by leveling bogus complaints to the SDPD about Plaintiff's qualifications and her eligibility for an SDPD press pass. Although Plaintiff held a press pass for over fifteen years, Defendants succumbed to Carless' pressure and attempted to revoke Plaintiff's press pass and then rejected Plaintiff's application to renew her press pass. SDPD's actions were based on Plaintiff's viewpoint. According, all analysis of Defendants' actions must be reviewed applying strict scrutiny.

123.   Plaintiff has been harmed by Defendants' unconstitutional actions and is entitled to nominal, compensatory, and punitive damages.

124.   Pursuant to Title 42 United States Code § 1983 and First Amendment, Plaintiff is entitled to preliminary and permanent injunctive relief restraining Defendants from denying Plaintiff a media identification card.

125.   Plaintiff has been harmed by Defendants' unconstitutional actions and is entitled to nominal, compensatory, and punitive damages.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## JURY DEMAND

Plaintiff hereby requests a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Court enter judgment for Plaintiff and against Defendants as follows:

A.      An order declaring that provisions of SDPD Procedure 1.31 identified herein are unconstitutional, both facially and as applied to plaintiff, under the Due Process Clause of the Fourteenth Amendment of United States Constitution;

B.      An order declaring that provisions of SDPD Procedure 1.31 identified herein are unconstitutional, both facially and as applied to plaintiff, under the First Amendment of United States Constitution;

C.      An order preliminarily and permanently enjoining Defendant City of San Diego, its officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction from enforcing the unconstitutional elements of SDPD Procedure 1.13 identified herein;

D.      An order preliminarily and permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction from denying Plaintiff's Application to renew her SDPD media identification card;

E.      Compensatory, nominal, and punitive damages;

F.      Costs of suit, including attorneys' fees and costs pursuant to 42 U.S.C. §1988;

G.      Such other declaratory relief consistent with the injunction as appropriate; and

H.     All other relief to which Plaintiff may be entitled.

Respectfully submitted,

Dated:  May 15, 2024                    by:

_____

D. Gill Sperlein
THE LAW OFFICE OF D. GILL SPERLEIN

Harmeet K. Dhillon
DHILLON LAW GROUP INC.

Attorneys for Attorneys
for Plaintiff Eva Knott

COMPLAINT