| | |
|---|---|
| 1 | D. GILL SPERLEIN (SBN: 172887) |
| 2 | gill@sperleinlaw.com<br>LAW OFFICE OF D. GILL SPERLEIN |
| 3 | 345 Grove Street<br>San Francisco, CA 94102 |
| 4 | Telephone: (415) 404-6615 |
| 5 | Facsimile: (415) 404-6616 |
| 6 | HARMEET K. DHILLON (SBN: 207873)<br>harmeet@dhillonlaw.com |
| 7 | DHILLON LAW GROUP INC.<br>177 Post Street, Suite 700 |
| 8 | San Francisco, California 94108<br>Telephone: (415) 433-1700 |
| 9 | Facsimile: (415) 520-6593 |
| 10 | *Attorneys for Eva Knott* |

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| EVA KNOTT, | ) | Case No.: **'24CV0855 BAS DDL** |
| Plaintiff, | ) | |
| v. | ) | **DECLARATION OF EVA KNOTT IN SUPPORT OF PLAINTIFF'S MOTION TO PROCEED USING PSUEDONYM AND MOTION FOR PRELIMINARY INJUNCTION** |
| THE CITY OF SAN DIEGO; POLICE CHIEF DAVID NISLEIT, in his representative capacity as Chief of Police; and LIEUTENANT ADAM SHARKI, in his representative capacity as SDPD Public Information Officer, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

I, Eva Knott, Declare:

1

CASE NO. _____
DECLARATION OF EVA KNOTT

1.     I am the plaintiff in this action. I have personal knowledge of the facts stated herein, unless stated on information and belief, and if called upon to testify to those facts I could and would competently do so.

2.     I have been a reporter for over fifteen years. I regularly write for the San Diego Reader, a local news publication which is both a weekly hardcopy paper, and a substantial online presence with their own website. I also report for The Post Millennial, an online news media presence. I specialize in covering crime and courts in San Diego County. Most recently, my work has concentrated on a large Antifa riot criminal case SCD274477 that has been working its way through state court since 2021. Sentencing dates for this 11-defendant case are set for next month, June 2024.

3.     Eva Knott is the *nom de plume* I use in my work as a journalist.

4.     When I have been at the courthouse gathering information for my news reporting, gang members have attempted to intimidate me. I have had gang members blatantly photograph and video record me. They have also seated themselves next to me in the courtroom. Female gang members have followed me into the women's restroom. Once, two peewees (young male gangsters) quickly got into the elevator with me, one on each side, laughing loudly and saying to each other, "Snitches end up in ditches!" Once, an agitated young man got very close to me and demanded to know why I wrote a story about him stealing a car.

5.     In 2008 or 2009, I received a handwritten letter sent to my home address from a convicted felon whose trial I had reported on. My husband and I found this to be deeply concerning. In fact, my husband was so horrified that he wanted me to stop reporting on court matters. I persuaded him that I could protect myself by using a pen name. I discussed the issue with my editor, and we agreed that for safety reasons I

would begin using a pen name. Since then, I have been known professionally as Eva Knott. I am a widow, but in my personal life I continue to use my married name.

6. Before the incident described in the immediately preceding paragraph, I had applied for and was issued a San Diego Police Department Media Identification Card (press pass) in my married name. After I adopted the pen name Eva Knott, I renewed my press pass using my pen name with the full knowledge of SDPD. Press passes must be renewed every two years, and each time I renewed my press pass, I applied using the name Eva Knott. As required by SDPD regulations, when my applications to renew my press pass were approved, I went to the police station to present a government issued ID and complete the credentialling process, although they did not always check my ID. As part of the process, I was required to turn in my expiring press pass. I was fingerprinted and a new photo was taken. A replacement pass was then issued with the new photograph. The number of the new pass remained the same as the number on the old pass. I followed this procedure every two years apart from one time during COVID when I was instructed to just pick up a new press pass with a new date.

7. In advance of state court proceedings, I routinely submit a completed Mandatory Judicial Council Form MC-500 and the accompanying proposed order Form MC-510 on behalf of either the San Diego Reader or the Post Millennial seeking a Court order allowing me, as a representative of those media outlets, to film, photograph, or record the proceedings. Consistent with my use of my pseudonym in connection with my reporting, I routinely used my pseudonym on the submitted MC-500/MC-510 Forms.

8. In August of 2022, I was regularly covering the criminal proceedings against 11 members of Antifa charged with various types of crimes. After one proceeding someone approached me and started demanding to know if Eva Knott was

my legal name. He got very close to me and held a phone/camera close to my face. I was unsure who this person was, I had just left an Antifa court hearing and was fearful that he was a violent Antifa person, and I chose not to give that stranger my married name. He also demanded to know if I lived in San Diego, and I replied that I lived in San Diego County (this information is on my public page on TwitterX as @EvaKnott.) Now I suspect that person was Will Carless, who writes favorable coverage about Antifa for the USA Today publication. This was confirmed by the emails to SDPD, from Will Carless, (discovered by my attorney's public record request) when Will Carless tried to make trouble for me by contacting SDPD and complaining of my use of a pen name.

9. In October 2022, I received an email from the email address MedialnquiryI@pd sandiego.gov stating that my press pass had been revoked. The email heavily implied that the reason it was revoked was because I applied using my pen name Eva Knott rather than my birth name or my married name. SDPD produced a copy of this email in response to my lawyer's public records request and it is attached to his declaration as an exhibit.

10. I was suspicious of the email. It did not make sense to me since SDPD had been aware I was using a pen name since I began doing so. When I first applied for a press pass from SDPD, I applied using my married name, and I assumed SDPD kept a record of that information. When we switched from my married name to my pen name, on my SDPD press pass, the police were completely aware of this switch and okayed it. Also, the email contained no signature block. It seemed odd to me that someone from SDPD would contact me via e-mail with such consequential news without identifying the name, rank, and position of the sender.

11. Since working on the Antifa criminal cases, I was on high alert with regard to my personal safety…even more so than usual. During the course of the criminal trial proceedings several incidents caused me concern for my safety. For example, I got a

4

CASE NO. _____
DECLARATION OF EVA KNOTT

call from a San Francisco phone number inquiring of my name, and I hung up on that man. Another time, when I was walking my dog in the evening, I saw one of the defendants sitting in a car outside of my condo building. Also, through my coverage of the case, I was aware that the Leah Madbak, girlfriend of Antifa defendant Jesse Cannon, worked in the Public Defender's Office and she used her position to look up personal info about witnesses and victims, and she passed this along to her Antifa compadres. I wrote an article about the situation which was published on line at: https://www.sandiegoreader.com/news/2022/apr/26/stringers-does-san-diego-antifa-man-have-doxing/ I obtained from the Clerk's Office a copy of a declaration signed by Deputy District Attorney Will Hopkins which discussed the violent nature of some of the criminal defendants. The declaration also discussed the fact that members of Antifa dox their targets. A copy of that Declaration is attached as **EXHIBIT N**. These facts also put doubt in my mind about the unsigned email stating that SDPD had revoked my press pass.

12. I sent a return email explaining that I had been using my pen name for years. I hoped that if the email was authentic, SDPD might reconsider their position once reminded of the facts. My email to SDPD did not get a reply, so that assured me I was correct in reasoning that it was a hoax or spoof from Antifa persons, and I kept busy with my reporting and tried not to be distracted by the hoaxers.

13. On February 22, 2023, the Post Millennial published a major article about the Antifa trial co-written by me and my writing partner Andy Ngo. The article heavily focused on Defendant Brian Cortez Lightfoot and included photographs I had taken of him and his attorney in the Courtroom. The next day, Lightfoot filed a motion seeking to revoke my courtroom press privileges. In the motion, Lightfoot claimed I had knowingly filed a false or forged instrument because I had signed my media request forms using my pen name. The motion included an allegation that my SDPD press pass had been revoked. The filing was so over the top, and in my mind so clearly in response

to my article, that I believed its sole purpose was to dox and intimidate me. Since the motion claiming SDPD had revoked my press pass was filed by an Antifa member, I still believed Antifa was the original source of the claim—perhaps more so than ever. I wondered, "how would Lightfoot or his attorney know anything about my press pass being revoked?" It is still not clear to me what happened.

14. I engaged an attorney to oppose the Lightfoot motion. The court rejected Lightfoot's motion, ruling from the bench that Lightfoot did not have standing to bring such a motion and stating that my using a pseudonym caused no harm.

15. Still unsure of the status of my press pass, my attorney wrote a cover letter that he delivered to SDPD Media Department along with my application to renew my press pass, which was set to expire April 1, 2024. My attorney described the facts of my applications to SDPD in his declaration, so I do not repeat them here.

16. SDPD claimed they denied my application because it did not demonstrate that I regularly need to cross police or fire lines. This makes no sense to me. For one thing, nothing with regard to my work has changed since I submitted the last several press pass renewal applications which SDPD approved. In fact, if anything, I rely on my press pass more now than ever. Covering the Antifa trial has been important to my journalism career. Writing with Andy Ngo about the Antifa trials has led to being published in the Post Millennial, which has a national and international reach far beyond the local publication the San Diego Reader.

17. I am frequently at the Courthouse, where Sheriff's deputies check press passes to determine who can sit in the front row of the gallery in the courtroom—a type of police line that I cross almost daily. Court clerks also expedite my access to court files when I have my press pass. Although it is not my primary concern by any means, having the parking pass that accompanies a press pass, assists me in my news gathering efforts.

18. The thing that makes news coverage so important (and interesting from my prospective) is that one never knows what is going to happen next. So, there may be many important stories relating to the areas I report on that I have no way of anticipating. However, there are several upcoming events that I plan to cover which will be negatively affected by my current lack of an SDPD press pass. I am particularly concerned about not having my press pass when the sentencing for the Antifa Defendants is announced on June 12th and 28th. It is likely that demonstrations will take place when the court announces those sentences. I intend to cover those demonstrations. Without an SDPD press pass, I will not have the same ability to cross police lines as SDPD press pass-carrying journalists. I am also specifically concerned about not having my press pass during the upcoming presidential elections, which are also very likely to result in demonstrations or civil unrest that I will want to cover.

I declare under penalty of perjury under the laws of the United States of America that the forgoing is true and correct.

Executed on May 13, 2024, at San Diego, California.

_____
Eva Knott (pseudonym)

# EXHIBIT N

# DECLARATION IN SUPPORT OF REQUEST FOR PROTECTIVE ORDER REGULATING RELEASE OF DISCOVERY

I, WILL HOPKINS declare as follows:

1. I am the Deputy District Attorney assigned the above-entitled case.
2. I know the Defendants, JOESPH GASKINS, ALEXANDER ACKRIDGE JACOBS, BRIAN LIGHTFOOT, JEREMY WHITE, SAMUEL OGDEN, CHRISTIAN MARTINEZ, LUIS MORA, BRIAN RIVERA, ERICH YACH, MARTIN TALAB, and JESSE CANNON, self-identify as members of the anarchist group commonly referred to as ANTIFA.
3. I further know that several of the Defendants and their affiliates have engaged in acts of violence on multiple occasions in multiple jurisdictions.
4. As a Deputy District Attorney, through the investigation of this case I have come across several gigabytes of data that the ANTIFA cells or "affinity groups", to which the Defendants belong, have collected on persons they have had any sort of disagreement with. These persons include, police officers, political rivals, elected officials and even their own members who have fallen out of favor.
5. The information we have discovered in their possession includes but is not limited to, police reports containing the target's home address, license plates, surveillance photos of individuals with their families, civil and criminal documents relating to these targets, San Diego Sheriff's Deputy, federal agents, and San Diego Police Officers names, badge numbers, duty assignments, salary information.
6. With this information I know that members of ANTIFA disseminate and share the information to "dox" their targets.
7. I know "doxing" to mean posting private information on the internet specifically, names addresses, IP addresses, email and social media accounts, place of work, identifying family members and any other type of private information that can be leveraged against the target.
8. I know that members of ANTIFA specifically use this information to harass, attack, and

stalk victims in order to socially, psychologically, and physically harm their targets.

9. I am aware that several of the defendants' and their affiliates have engaged in this type of behavior within their respective Antifa cells or "affinity groups".

10. I know recently social media accounts associated with several of the Defendants posted pictures of people they believed to be the victims in this case just last week on December 8, 2021, in an apparent attempt to intimidate or dissuade them from testifying. (Attachment 1)

11. I know that during the service of search warrants in this case several of the defendants were found to be in the possession of police reports that were not associated with their own cases. (Attachment 2)

12. I know that several public officials had their home addresses posted by these groups and that there was at least one instance of physical violence that resulted outside of one of the public official's home which was perpetrated by ERICH YACH.

13. Several firearms have been recovered from the service of search warrants executed in this case. Further, there is evidence that several of these defendants have access to other weapons which were not recovered. (See Attachment 3)

14. I have been notified that at least one of the victims specific to this case has already been targeted by these tactics in what appears to Law Enforcement to be an attempt at dissuading him/her from cooperating in this case.

15. I am also aware that JESSE CANNON is or was romantically involved with LEAH MADBAK who works as an Investigator for the San Diego Public Defender's Office. I have seen evidence that both CANNON and MADBAK run and or have administrative privileges for several Antifa based social media accounts, specifically SDagainstFash, sdreportingcollective, S.N.A.I.L. Cru and R.A.B.I.D.. I know they have posted police reports and intentionally disseminated potentially harmful information in an attempt to "dox" their targets. (Attachment 4)

16. I believe that should the discovery in this case be provided to other members of this organization, it will endanger future criminal prosecution and the safety of witnesses and victims in the present case.

6

PROTECTIVE ORDER

17. Considering the very real dangers associated with witnesses providing information to law enforcement, the People believe there is a very real threat to the safety of the witnesses, investigating officers, and victims in this case should the Defendants be allowed to have carte blanche access to do whatever they wish with the discovery materials from this case.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:

_____
WILL HOPKINS
Deputy District Attorney-Declarant