D. GILL SPERLEIN (SBN: 172887)
gill@sperleinlaw.com
LAW OFFICE OF D. GILL SPERLEIN
345 Grove Street
San Francisco, CA 94102
Telephone: (415) 404-6615
Facsimile: (415) 404-6616

HARMEET K. DHILLON (SBN: 207873)
harmeet@dhillonlaw.com
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, California 94108
Telephone: (415) 433-1700
Facsimile: (415) 520-6593

*Attorneys for Eva Knott*

## UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| EVA KNOTT, | Case No.: **'24CV0855 BAS DDL** |
| Plaintiff, |  |
| v. | PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION |
| THE CITY OF SAN DIEGO; POLICE CHIEF DAVID NISLEIT, in his representative capacity as Chief of Police; and LIEUTENANT ADAM SHARKI, in his representative capacity as SDPD Public Information Officer, |  |
| Defendants. |  |

# NOTICE OF MOTION

**PLEASE TAKE NOTICE** that pursuant to FED. R. CIV. P. 65, on

_____ at _____ or as soon thereafter as can be heard, in Courtroom

_____ of the above-entitled Court, located at 333 West Broadway, San Diego, CA

92101, Plaintiff EVA KNOTT, will, and hereby does move this Court for a Preliminary

Injunction to prevent Defendants from denying the rights guaranteed to Plaintiff by the

First and Fourteenth Amendments of the United States Constitution.

This Motion will be based on this Notice of Motion and Motion, the Points and

Authorities herein, the declarations and exhibits to the Motion, pleadings and papers

filed in this matter, and on any other evidence as the parties may submit at the hearing

on the Motion, if any.

Respectfully submitted,

Dated: 5/15/2024                    by:

_____
D. Gill Sperlein
THE LAW OFFICE OF D. GILL SPERLEIN

Harmeet K. Dhillon

Dhillon Law Group Inc.

Attorneys for Plaintiff Eva Knott

# TABLE OF CONTENTS

NOTICE OF MOTION........................................................................................... II

TABLE OF AUTHORITIES ................................................................................. IV

MEMORANDUM OF POINTS AND AUTHORITIES .................................................. 1

INTRODUCTION ............................................................................................... 1

FACTUAL BACKGROUND .................................................................................. 3

ARGUMENT ..................................................................................................... 4

   I.   LEGAL STANDARD ................................................................................ 4

   II.   PLAINTIFF IS SUFFERING AND WILL CONTINUE TO SUFFER IRREPARABLE HARM .. 5

   III.   PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS. ....................................... 5

      A.   *Plaintiff's Procedural Due Process Claims Are Likely to Succeed.* ................. 5

         1)   Deprivation of a Liberty Interest Protected by the Constitution.................... 6

         2)   Lack of Process. ...................................................................... 9

         3)   Government's Interests. ............................................................. 16

         4)   Additional Considerations. .......................................................... 16

      B.   *Plaintiff's First Amendment Claim Is Likely to Succeed.* ........................... 17

         1)   Success Is Likely Irrespective of the Test Applied. .............................. 17

         2)   The SDPD's Press Credentialing Process Violates the Unbridled Discretion Doctrine. ............................................................................. 19

         3)   Defendants Can Point to No Legitimate Reason for Denying Plaintiff a Press Pass. ............................................................................. 23

   IV.   THE BALANCE OF EQUITIES AND PUBLIC INTEREST LIES WITH THE PLAINTIFF. .. 23

   V.   THE COURT SHOULD NOT REQUIRE A BOND. .............................................. 24

CONCLUSION................................................................................................. 25

TABLE OF AUTHORITIES

C<small>ASES</small>

*Abrams v. United States,* 250 U.S. 616 (1919) ................................................................. 10

*Alaska Landmine, LLC v. Dunleavy*, 514 F. Supp. 3d 1123 (D. Alaska 2021) .......... 2, 18

*All. For The Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ........................... 4

*Am. Broad. Cos. v. Cuomo*, 570 F.2d 1080 (2d Cir. 1977) ............................................ 7

*Arkansas Educ. Television Com'n v. Forbes*, 523 U.S. 666 (1998) .............................. 19

*Ateba v. Jean-Pierre,* 2023 U.S. Dist. LEXIS 217521 (D.D.C. Dec. 7, 2023) ............. 18

*Baby Tam & Co. v. City of Las Vegas*, 154 F.3d 1097 (9th Cir. 1998) ......................... 21

*Barahona-Gomez v. Reno*, 167 F.3d 1228 (9th Cir. 1999) ............................................ 25

*Barnes v. Healy*, 980 F.2d 572 (9th Cir. 1992) ............................................................. 13

*Bd. of Regents v. Roth,* 408 U.S. 564 (1972) ............................................................ 7, 10

*Branzburg v. Hayes*, 408 U.S. 665 (1972) ..................................................................... 7

*Bullfrog Films, Inc. v. Wick*, 847 F.2d 502 (9th Cir. 1988) ......................................... 12

*Cable News Network, Inc. v. Trump*, No. 18-2610, 2018 WL 9436958 (D.D.C. Nov. 16,
    2018) ......................................................................................................................... 8

*Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319 (9th Cir.
    1985) ....................................................................................................................... 25

*Carey v. Brown*, 447 U.S. 455 (1980) .......................................................................... 22

*Chi. Teachers Union, Local No. 1 v. Hudson*, 475 U.S. 292 (1986) ......................... 2, 10

*City of Lakewood v. Plain Dealer Publ'g Co.,* 486 U.S. 750 (1988) ........................ 1, 22

*Clemente v. United States*, 568 F. Supp. 1150 (C.D. Cal. 1983) ................................. 17

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985) ....................................... 11

*Connally v. Gen. Constr. Co.*, 269 U.S. 385 (1926) ..................................................... 12

*Consumers Union v. Periodical Correspondent' Ass'n*, 365 F. Supp. 18 (D.D.C. 1973) 7

*Cox Broad. Corp. v. Cohn,* 420 U.S. 469 (1975) .......................................... 10, 24

*Dehne v. Avanino*, 219 F. Supp. 2d 1096 (D. Nev. 2001) ............................... 12

*Elrod v. Burns*, 427 U.S. 347 (1976) ................................................................ 5

*Farris v. Seabrook*, 677 F.3d 858 (9th Cir. 2012) .......................................... 4

*Fuentes v. Shevin*, 407 U.S. 67 (1972) ............................................................ 15

*FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990) ..................................... 21

*Garcia v. Google, Inc.*, 786 F.3d 733 (9th Cir. 2015) ..................................... 4

*Gitlow v. New York,* 268 U.S. 652 (1925) ........................................................ 6

*Goldberg v. Kelly*, 397 U.S. 254 (1970) ........................................................ 14

*Gordon v. Holder*, 721 F.3d 638  (D.C. Cir. 2013) ....................................... 24

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ........................................ 12

*Hernandez v. Sessions,* 872 F.3d 976 (9th Cir. 2017) ..................................... 24

*Hudick v. Wilkie*, 755 F. App'x 998 (Fed. Cir. 2018)...................................... 17

*In re Shortridge*, 99 Cal. 526 (1893) ............................................................. 11

*John K. MacIver Inst. for Pub. Policy, Inc. v. Evers*, 994 F.3d 602 (7th Cir. 2021) 18, 20

*Johnson v. Ryan*, 55 F.4th 1167 (9th Cir. 2022)............................................. 6

*Jorgensen v. Cassiday*, 320 F.3d 906 (9th Cir. 2003) ..................................... 24

*Leiserson v. City of San Diego*, 184 Cal. App. 3d 41 (1986) ...................... 8, 23

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) ....................................... 24

*Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263 (9th Cir. 2023) ......... 5

*Nicholas v. City of N.Y.*, No. 15-CV-9592 (JPO), 2017 U.S. Dist. LEXIS 26995

    (S.D.N.Y. Feb. 27, 2017)...................................................................... 8, 18

*Niemotko v. Maryland*, 340 U.S. 268 (1951)................................................. 16

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983)............... 21, 22

*Pleasant Grove City v. Summum*, 555 U.S. 460 (2009) .................................. 22

*Porter v. Gore*, 517 F. Supp. 3d 1109 (S.D. Cal. 2021) ...................................................5

*Portman v. County of Santa Clara*, 995 F.2d 898 (9th Cir. 1993) ................................6

*Quad-City Cmty. News Serv., Inc. v. Jebens*, 334 F. Supp. 8 (S.D. Iowa 1971) ...... 18, 21

*Real v. City of Long Beach*, 852 F.3d 929 (9th Cir. 2017) ..........................................21

*Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980)......................................24

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995).......................22

*Sessions v. Dimaya*, 584 U.S. 148 (2018)....................................................................12

*Sheppard* v. *Maxwell*, 384 U.S. 333 (1966) ......................................................... 11, 24

*Sherrill v. Knight*, 569 F.2d 124 (D.C. Cir. 1977)....................................7, 10, 18, 23

*Shuttlesworth v. Birmingham*, 394 U.S. 147 (1969)....................................................19

*Southeastern Promotions v. Conrad*, 420 U.S. 546 (1975) ........................................19

*Spirit of Aloha Temp. v. Cty. of Maui*, 49 F.4th 1180 (9th Cir. 2022)............................1

*TGP Communs., Ltd. Liab. Co. v. Sellers*, No. 22-16826, 2022 U.S. App. LEXIS 33641

  (9th Cir. Dec. 5, 2022) ...................................................................................passim

*Tom Growney Equip. v. Shelley Irrigation Dev.*, 834 F.2d 833 (9th Cir. 1987) ............11

*United States v. 101 Houseco, LLC*, 22 F.4th 843 (9th Cir. 2022).................................6

*United States v. Associated Press,* 52 F. Supp. 362 (S.D.N.Y. 1943) ...........................10

*United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803 (2000 .......................................4

*United States v. Schwimmer*, 279 U.S. 644 (1929)......................................................10

*Vitarelli v. Seaton*, 359 U.S. 535 (1959)....................................................................17

*Wilkinson v. Austin,* 545 U.S. 209 (2005)......................................................................6

*Wolff v. McDonnell*, 418 U.S. 539 (1974) ......................................................................6

*Yvon v. City of Oceanside*, 202 F. Supp. 3d 1147 (S.D. Cal. 2016) .............................21

*Zinermon v. Burch*, 494 U.S. 113 (1990) ............................................................ 11, 16

## Statutes

California Penal Code § 409.5.................................................................8, 10, 21

California Penal Code § 409.7.................................................................8, 10, 21

California Penal Code § 409.9...........................................................................8

California Public Records Act, Gov. Code, § 6250, *et seq* .............................11

Freedom of Information Act (FOIA), 5 U.S.C.S. § 552 ...................................10

## Other Authorities

G. Gunther, *Cases and Materials on Constitutional Law* 1373 (10th ed. 1980)---------- 2

Henry J. Friendly, "*Some Kind of Hearing*," 123 U. Pa. L. Rev. 1267 (1975)----------- 11

Henry Monaghan, *First Amendment "Due Process"*, 83 Harv. L. Rev. 518 (1970)- 2, 10

Reina Caldron, *Bond Requirements Under Federal Rule of Civil Procedure 65(c): An Emerging Equitable Exemption for Public Interest Litigants*, 13 B.C. Envtl. Aff. L. Rev. 125 (1985) ------------------------------------------------------------------- 24

## Constitutional Provisions

U.S. Const., Amend. I ------------------------------------------------------------passim

U.S. Const., Amend. XIV ---------------------------------------------------------passim

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Plaintiff is a San Diego-based journalist who has reported on crime and the courts in the region for over fifteen years. Decl. of Eva Knott (Knott Decl.) at ¶2. Due to concerns for her personal safety, she writes under the *nom de plume* Eva Knott. *Id*. at ¶¶ 3 & 5. In conjunction with her news gathering, Plaintiff relies on the use of a press pass issued by San Diego's Police Department (SDPD). *Id*. at ¶ 17 & 18. Despite having approved her press pass applications at least at least a half a dozen times in the past, when Plaintiff recently applied to renew her pass, SDPD denied the application on the pretextual reason that her application did not demonstrate a need to cross police or fire lines on a regular basis, which SDPD claims is an eligibility requirement for a press pass. *Id*. at ¶ 16; Decl. of D. Gill Sperlein (Sperlein Decl.) at ¶¶ 6-10.

SDPD never informed Plaintiff what facts are necessary to demonstrate "a need to cross police or fire lines on a regular basis." *Id*. Nor did SDPD provide Plaintiff a hearing or any other opportunity to present her arguments against the decision to deny her application. Sperlein Decl. at ¶9 & Ex. D.

One of the driving considerations in First Amendment jurisprudence is whether government action will have a chilling effect on speech. If a licensing scheme gives the government unfettered discretion, officials may deny licenses to disfavored speech or speakers while claiming the denial is based on a violation of a nebulous or subjective provision of the licensing scheme. To protect against this concern, the Supreme Court and the Ninth Circuit have routinely invalidated laws that give a government official unfettered discretion to grant, deny, or revoke a license to engage in First Amendment protected activity. *City of Lakewood v. Plain Dealer Publ'g Co.,* 486 U.S. 750 (1988); *Spirit of Aloha Temp. v. Cty. of Maui,* 49 F.4th 1180, 1190 (9th Cir. 2022) (holding zoning scheme regulating where churches could operate granted permitting officials an

impermissible degree of discretion). News gathering is a First Amendment protected activity. *See TGP Communs., Ltd. Liab. Co. v. Sellers*, No. 22-16826, 2022 U.S. App. LEXIS 33641 (9th Cir. Dec. 5, 2022).

Knowing officials can pretextually use the imprecise provision to support the denial or revocation of their license, license holders will toe the line, pull punches, and generally constrain their speech to avoid the ire of the government officials who determine who will be granted the "privilege" to speak. *City of Lakewood*, 486 U.S. at 757 ("the mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused."); *see also Kaahumanu v. Hawaii*, 682 F.3d 789, 807 (9th Cir. 2012) ("[C]onferring an unbridled discretion on a licensing official creates the danger of self-censorship, as well as a danger of government censorship. A citizen may hesitate to express, or refrain from expressing, his or her viewpoint for fear of adverse government action such as the denial of a permit."). SDPD's policies governing press passes run afoul of constitutional requirements.

Where First Amendment rights are at play, the need for Due Process is heightened. *Chi. Teachers Union, Local No. 1 v. Hudson*, 475 U.S. 292, 303 n.12 (1986) ("[Procedural] safeguards often have a special bite in the First Amendment context." (citing G. Gunther, *Cases and Materials on Constitutional Law* 1373 (10th ed. 1980))). "The purpose of these safeguards is to insure [sic] that the government treads with sensitivity in areas freighted with First Amendment concerns." *Id.* (citing Henry Monaghan, *First Amendment "Due Process"*, 83 Harv. L. Rev. 518, 520-524 (1970)); *see also Alaska Landmine, LLC v. Dunleavy*, 514 F. Supp. 3d 1123, 1134 (D. Alaska 2021) (noting that due process is the vehicle by which First Amendment rights are protected because "[t]he absence of any formal process, policy, or procedure makes meaningful judicial review difficult, if not impossible").

Defendants denied Plaintiff important First Amendment rights with little to no process. As Plaintiff is suffering irreparable harm, the Court should enjoin Defendants from further violating her rights during the pendency of this litigation.

## FACTUAL BACKGROUND

In the City of San Diego, like many jurisdictions around the country, the Police Department issues press passes to qualified journalists in order to identify journalists so that they can cross police lines and fire lines, use otherwise restricted parking spaces, and attend certain press briefings by governmental bodies including SDPD and the Sheriff's Department. Sperlein Decl. at **Ex. F**. SDPD honors press passes from other law enforcement agencies, and other agencies honor SDPD issued press passes. *Id*. at § VI(f).

Plaintiff first applied for and was granted an SDPD press pass approximately fifteen years ago, when she applied using her married name. Knott Decl. at ¶ 6. In approximately 2009, after receiving a handwritten letter from a convict whose case she reported on, Plaintiff became concerned for her safety and started using the pen name Eva Knott. *Id*. at ¶5. When she applied to renew her press pass, she used her pen name. *Id*. at ¶6. After SDPD approved her application, she went to the police station to complete the credentialing process, which includes checking the applicant's ID and taking a new photograph. *Id*. She followed that same procedure every two years through 2022. *Id*.

In October 2022, Plaintiff received an unsigned email from <MediaInquiry@pd.sandiego.gov> stating that her press pass had been revoked and implying that the use of her pen name was the cause for the revocation. *Id*. at ¶ 9. Plaintiff suspected the email was a hoax perpetrated by members of Antifa since at the time she was covering a criminal trial of 11 of its members and she was aware that the group had a history of computer hacking and doxing its critics. *Id*. at ¶¶ 10 & 11.

The day after Plaintiff published a major article about the trial, one of the criminal defendants filed a motion to revoke Plaintiff's courtroom press privileges. *Id*. at ¶ 13. The motion included an assertion that SDPD had revoked her press pass for fraudulently using a false name, making Plaintiff even more suspicious that the email about her press pass being revoked was fabricated by Antifa. *Id.*

Unsure of the status of her current press pass, which was scheduled to expire on April 1, 2024, Plaintiff submitted an application to renew her press pass. *Id*. at ¶ 15; Sperlein Decl. at ¶6 & **Ex. A**. SDPD denied the pass claiming the application did not demonstrate a need to cross police and/or fire lines on a regular basis. *Id*. at ¶ 9 and **Ex. D**. Despite a request from Plaintiff's counsel, SDPD did not explain what facts it based its decision on and did not allow Plaintiff to appeal the decision. *Id*. at ¶ 10 and **Ex. E**.

## ARGUMENT

### I.    Legal Standard

To obtain a preliminary injunction, a plaintiff must show: (1) they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [their] favor"; and (4) "an injunction is in the public interest." *Garcia v. Google, Inc*., 786 F.3d 733, 740 (9th Cir. 2015) (citing *Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012)). A party can also satisfy the first and third elements of the test by raising serious questions going to the merits of its case and a balance of hardships that tips sharply in its favor. *All. For The Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-35 (9th Cir. 2011).

While Plaintiffs usually have the burden of proof for each of these factors, once Plaintiff establishes that Defendants' actions impact First Amendment protected activity, the burden shifts to the government to establish that its actions meet First Amendment scrutiny. *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000) ("When the Government restricts speech, the Government bears the burden of

proving the constitutionality of its actions."); *Porter v. Gore*, 517 F. Supp. 3d 1109, 1124 (S.D. Cal. 2021).

## II.     Plaintiff Is Suffering and Will Continue to Suffer Irreparable Harm

Constitutional injuries are irreparable due to their very nature. This is particularly true in the case of First Amendment rights. *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). The Ninth Circuit has consistently ruled that loss of First Amendment rights establishes irreparable harm sufficient to meet the requirements of a preliminary injunction. A Ninth Circuit panel reaffirmed the principal just several months ago, favorably quoting *Elrod*. *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1283 (9th Cir. Nov. 7, 2023). More specifically, the Ninth Circuit recently held that the loss of press pass privileges constitutes irreparable harm. *TGP Communs., Ltd. Liab. Co. v. Sellers*, 2022 U.S. App. LEXIS 33641 at *15 (finding plaintiff's harm "cannot be rendered de minimis or otherwise mitigated by requiring Plaintiffs to avail themselves of a less desirable, even if somewhat effective, alternative"). Moreover, Plaintiff has specifically identified reasons she requires the press pass prior to final judgment. Knott Decl. at ¶¶ 17 & 18.

## III.     Plaintiff is Likely to Succeed on the Merits.

SDPD's standardless press credentialing scheme is unconstitutional for at least two reasons. First, it violates the due process clause by failing to provide adequate procedures for approving or revoking press passes. And second, it violates the First Amendment by conferring unbridled discretion on officials administrating the program.

### A. Plaintiff's Procedural Due Process Claims Are Likely to Succeed.

The Due Process Clause of the Fourteenth Amendment provides that no state may "deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV. To obtain relief on a procedural due process claim, the plaintiff

must establish the existence of "(1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; [and] (3) lack of process." *Portman v. County of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993). The Ninth Circuit sometimes combines the first two factors by first determining whether the plaintiff was deprived of a constitutionally protected liberty or property interest and then examining whether the deprivations was accompanied by sufficient process. *Johnson v. Ryan*, 55 F.4th 1167, 1179 (9th Cir. 2022) (citing *United States v. 101 Houseco, LLC*, 22 F.4th 843, 851 (9th Cir. 2022) ("[T]o analyze a procedural due process claim, we engage in a two-step analysis: First, we determine whether the [individual] was deprived of a constitutionally protected liberty or property interest. Second, we examine whether that deprivation was accompanied by sufficient procedural protections.")).

### 1) Deprivation of a Liberty[1] Interest Protected by the Constitution.

"A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty.'" *Wilkinson v. Austin,* 545 U.S. 209, 221 (2005). "[O]r it may arise from an expectation or interest created by state laws or policies." *Id.* (citing *Wolff v. McDonnell*, 418 U.S. 539, 556-558 (1974)). Here Plaintiff's interest arises from both the First Amendment and from state law.

The Supreme Court has long held that "freedom of speech and of the press" as guaranteed by the "First Amendment . . . are among the fundamental personal rights and 'liberties' protected by the due process clause of the Fourteenth Amendment from impairment by the States." *Gitlow v. New York,* 268 U.S. 652, 666 (1925); *see also Bd.*

---

[1] Plaintiff also holds a property interest in an SDPD press pass which also requires due process. *See Sherrill v. Knight*, 569 F.2d 124, 131 n.22 (D.C. Cir. 1977). Plaintiff preserves the right to raise arguments related to the property interest at later stages of this litigation.

*of Regents v. Roth,* 408 U.S. 564, 575 n.14 (1972) (explaining that due process is required before "a State [may take action that] would directly impinge upon interests in free speech or free press"). Freedom of the press includes the right to gather news, for "without some protection for seeking out the news, freedom of the press could be eviscerated." *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972).

The newsgathering right protected by the First Amendment includes the guarantee that members of the press will have equal access. "While it is perfectly true that reporters do not have an unrestricted right to go where they please in search of news . . . the elimination of some reporters from an area which has been voluntarily opened to other reporters for the purpose of news gathering presents a wholly different situation." *TGP Communs.,* 2022 U.S. App. LEXIS 33641, at *15-16 (*quoting Consumers Union v. Periodical Correspondents' Ass'n*, 365 F. Supp. 18, 25-26 (D.D.C. 1973), *rev'd on other grounds*, 515 F.2d 1341 (D.C. Cir. 1975)). Other Circuits agree. *Am. Broad. Cos. v. Cuomo*, 570 F.2d 1080, 1083 (2d Cir. 1977) ("[O]nce there is a public function, public comment, and participation by some of the media, the First Amendment requires equal access to all of the media or the rights of the First Amendment would no longer be tenable."); *Sherrill v. Knight*, 569 F.2d 124, 129 (D.C. Cir. 1977) ("White House press facilities having been made publicly available as a source of information for news[persons], the protection afforded newsgathering under the first amendment guarantee of freedom of the press requires that this access not be denied arbitrarily or for less than compelling reasons.") (citations omitted). "This first amendment interest undoubtedly qualifies as liberty which may not be denied without due process of law under the fifth amendment." *Id*. As a result, courts routinely recognize press passes as a liberty interested protected by the due process clause. *Id*. at 128 (noting that "denial of a pass potentially infringes upon first amendment guarantees" and that "[s]uch impairment of this interest cannot be permitted to occur in

the absence of adequate procedural due process"); *Nicholas v. City of N.Y.*, No. 15-CV-9592 (JPO), 2017 U.S. Dist. LEXIS 26995, at \*20-21 (S.D.N.Y. Feb. 27, 2017) ("That press access implicates First Amendment rights and interests—held not only by the journalists, but also by the public at large—provides additional support for finding a protected interest in NYPD-issued press credentials."); *Cable News Network, Inc. v. Trump*, No. 18-2610, 2018 WL 9436958 (D.D.C. Nov. 16, 2018), ECF No. 22 ("[I]f *Sherrill* stands for anything at all, I think it's unavoidable to . . . conclude anything other than it stands for the Fifth Amendment's due process clause protects a reporter's First Amendment liberty interest in a White House press pass.").

Independently, Plaintiff has a liberty interest conferred through state law. California Penal Code §§ 409.5 and 409.9 allow law enforcement to close public areas during emergency situations. However, these statutes exempt media representatives and allow them to cross police lines. Cal. Penal Code §§ 409.5 (d)(1) and 409.6(d) ("This section shall not prevent a duly authorized representative of a news service, newspaper, or radio or television station or network from entering the areas closed pursuant to this section."). Similarly, § 409.7 ensures media access when peace officers close areas surrounding public protests. These statutes apply to *all* duly authorized media representatives, and not just full-time reporters or those who "regularly need to cross police or fire lines." "[T]he press access provision of subdivision (d) assumes the existence of an already-determined safety hazard. Notwithstanding such a safety hazard, the Legislature has concluded that the public's right to know is more important." *Leiserson v. City of San Diego*, 184 Cal. App. 3d 41, 51 (1986). "Accordingly, press representatives must be given unrestricted access to disaster sites unless police personnel **at the scene** reasonably determine that such unrestricted access *will interfere* with emergency operations. If such a determination is made, the restrictions on media access may be imposed for only so long and only to such an extent as is necessary to

prevent actual interference. This means that members of the press must be accommodated with whatever limited access to the site may be afforded without interference." *Id*. (bold added, italics in original).

In sum, Plaintiff has a First Amendment liberty interest in accessing areas that government officials have opened to other news reporters, as well as a California-created liberty interest in accessing emergency areas otherwise temporarily closed to the general population by public officials.[2] The possession of a law enforcement issued press pass is the means by which reporters exercise those rights.[3] Thus, by denying Plaintiff a press pass, Defendants have deprived her the ability to exercise her liberty interests by the primary means available to media representatives. When denying such rights, state actors must provide sufficient process. Here, Defendants failed to meet this constitutional dictate.

### 2) Lack of Process.

To determine whether the procedural protections provided were sufficient, courts consider (1) the private interest affected; (2) the risk of an erroneous deprivation and the probable value of any additional or substitute procedural safeguards; and (3) the government's interest. *Johnson*, 55 F.4th at 1179.

### i. Private Interest Affected

---

[2] There is no dispute that Plaintiff is a bona fide news media representative. SDPD issued Plaintiff a media identification card in approximately 2008 and renewed it every two years before denying her most recent renewal application. SFPD's denial did not dispute her qualification as a media representative. Knott Decl. at ¶ 6.

[3] Pursuant to SDPD Policy, "[w]hen members of the media present valid media identification cards and have in their possession a blue Vehicle Identification Placard, they should be permitted to drive through police and/or fire lines (not into crime scenes) provided that public safety and order will not be jeopardized and that investigations by police or fire departments will not be hampered." Sperlein Decl. at **Ex. F**, SDPD Procedure 1.31, §VI (C).

First Amendment interests are paramount, and they are particularly vulnerable to inadequate procedure. *Chi. Teachers Union* , 475 U.S. at 303 n.12 ("[F]irst amendment rights are fragile and can be destroyed by insensitive procedures.") (quoting Monaghan, *First Amendment "Due Process"*, 83 Harv. L. Rev. at 551). Accordingly, heightened procedures are required when government actions restrain First Amendment protected activity. *See Roth*, 408 U.S. at 575 n.14 (collecting cases requiring a fair adversarial hearing.)

When evaluating restrictions on news gathering, courts should take into account the rights of members of the public who have  an interest—protected by the First Amendment and California law—in assuring that restrictions on newsgathering are no more arduous than necessary and that individual journalists are not arbitrarily excluded from sources of information. *Sherrill*, 569 F.2d at 130 (citing *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 491-92 (1975)); *Abrams v. United States,* 250 U.S. 616, 630 (1919) (Holmes, J., dissenting); *United States v. Associated Press,* 52 F. Supp. 362, 372 (S.D.N.Y. 1943) (noting that "right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection") (L. Hand, J.); Cal. Pen. Code §§ 409.5, 409.6, and 409.7. The need for heightened procedures is especially important when government authorities burden journalists who present alternative, less popular, or disfavored points of view. *See United States v. Schwimmer*, 279 U.S. 644, 654-55 (1929) (Holmes, J.) ("[I]f there is any principle of the Constitution that more imperatively calls for attachment than any other it is the principle of free thought - not free thought for those who agree with us but freedom for the thought that we hate.").

The public's interest in the gathering of, and access to, information is further evidenced by laws designed to ensure press access to governmental operations (Freedom of Information Act (FOIA), 5 U.S.C.S. § 552; California Public Records Act,

Gov. Code, § 6250, *et seq*.), and a long line of federal and state cases requiring press access to the courts. *See Sheppard* v. *Maxwell*, 384 U.S. 333, 350 (1966) (noting that it is a vital function of the press to subject the judicial process to "extensive public scrutiny and criticism."); *In re Shortridge*, 99 Cal. 526, 530 (1893) ("[I]it is a first principle that the people have the right to know what is done in their courts.")

The cases discussed and cited above demonstrate that the interests at stake for Plaintiff, other journalists, and the public weigh heavily in favor of applying robust due process procedures when SDPD decides which journalists will be allowed press passes.

### ii. Risk of an Erroneous Deprivation / Value of Alternatives

"The essential requirements of due process…are notice and an opportunity to respond. The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985) (citing Henry J. Friendly, "*Some Kind of Hearing*," 123 U. Pa. L. Rev. 1267, 1281 (1975)). The Supreme Court "usually has held that the constitution requires some kind of a hearing *before* the State deprives a person of liberty of property." *Zinermon v. Burch*, 494 U.S. 113, 127 (1990) (collecting cases).[4] In the Ninth Circuit a pre deprivation hearing is required unless extraordinary circumstances are present. *Tom Growney Equip. v. Shelley Irrigation Dev.*, 834 F.2d 833, 835 (9th Cir. 1987).

---

[4] "On occasion, [the Supreme Court] has recognized that where the potential length or severity of the deprivation does not indicate a likelihood of serious loss and where the procedures underlying the decision to act are sufficiently reliable to minimize the risk of erroneous determination, government may act without providing additional 'advance procedural safeguards.'" *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 19 (1978) (citing *Ingraham* v. *Wright*, 430 U.S. 651, 680 (1977)).

Current SDPD procedures regulating press passes fail to notify applicants of what is required to qualify for a press pass or what procedures SDPD will follow when evaluating applications for press passes. Sperlein Decl. at **Ex. F**, SDPD Proc. 1.31. The procedures also fail to provide for a hearing either before or after a denial of an application for a press pass. *Id*. at ¶10 and **Ex. E**. Therefore, the procedures are unconstitutional facially and as applied to Plaintiff.

Alternative procedures providing for at minimum notice and a fair hearing will certainly reduce the risk of further depravations of journalists' liberty interests in obtaining and maintaining an SDPD press pass. "[T]he value of additional procedural safeguards is obvious." *Dehne v. Avanino*, 219 F. Supp. 2d 1096, 1112 (D. Nev. 2001).

### 1. Lack of Notice

"Fair notice of the law's demands […] is 'the first essential of due process.'" *Sessions v. Dimaya*, 584 U.S. 148, 183 (2018) (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)). Thus, due process requires that insufficiently clear regulations be held void for vagueness. *Grayned v. City of Rockford*, 408 U.S. 104 (1972). "[W]here the guarantees of the First Amendment are at stake the Court applies its vagueness analysis strictly." *Bullfrog Films, Inc. v. Wick*, 847 F.2d 502, 512 (9th Cir. 1988).

The qualifications SDPD press pass applicants must meet are identified in SDPD's Procedure 1.31 §V. Sperlein Dec. at **Ex. F**. SDPD denied Plaintiff's application claiming she did not meet the requirement found at subsection B which demands that "[t]he applicant must demonstrate a need to cross police and/or fire lines on a regular basis." *Id*. at ¶ 9 & **Ex. D**. The procedure does not define what it means to "need" to cross police or fire lines, what constitutes a "regular basis," or otherwise explain how applicants can demonstrate what is required to fulfill the qualification.

The required application form provides no additional clues about this requirement. *See Id.* at **Exs. A & M**. The application consists of spaces where an applicant can provide the information SDPD Procedure 1.31 § IV-B requires, which includes basic identifying information about the journalist or media organization applying for the press pass. *Id.* However, the application does not request information about the applicant's "need to regularly cross police or fire lines." Nor does it provide space where the applicant can enter such information. *Id.*

The completed application form recently submitted by Plaintiff was substantially similar to application forms submitted by Plaintiff and approved by SDPD multiple times in the past. Knott Decl. at ¶¶ 6 & 16. Since neither SDPD Procedure 1.31, nor the application form provided information from which Plaintiff could determine how to comply with the requirement, her attorney submitted a public records request to SDPD asking for any additional procedures relating to processing press pass applications. Sperlein Decl. at ¶ 11. SDPD produced several tranches of documents with the final production delivered on April 15, 2024. *Id.* at ¶ 12. None of the produced documents provided any additional information about the process for determining whether a press pass applicant demonstrates a need to regularly cross police or fire lines. *Id.* In fact, nothing in the production suggests that SDPD has ever denied an application on this basis before. *Id.*

When the government denies a liberty or property interest, due process also obligates the government to explain its reasons for the denial. *Barnes v. Healy*, 980 F.2d 572, 579 (9th Cir. 1992) ("Due process requires notice that gives an agency's reason for its action in sufficient detail that the affected party can prepare a responsive defense."). Since Procedure 1.31 does not explain the "need to cross police lines on a regular basis" requirement, it is all the more important that SDPD provide an explanation of the factual basis for its decision. "Without notice of the specific reasons for denial, a

claimant is reduced to guessing what evidence can or should be submitted in response." *Id*.

Confusing the matter further, Lt. Sharki's November 9, 2023 email informed Plaintiff that the SDPD's denial of her application was not based on an independent investigation, or even based on facts independently known to the person or persons reviewing the application.[5] *Id* at ¶ 9 and **Ex. D**. Rather, the application was denied because the "application [did] not demonstrate this need." *Id*. Thus, SDPD's denial email does not inform Plaintiff of the evidence used to support its denial or answer the obvious question, "how could the application demonstrate a need to regularly cross police and fire lines when it does not even request that information or provide space for it?" SDPD's failure to identify the evidence it relied upon violates due process. *See Goldberg v. Kelly*, 397 U.S. 254, 271 (1970) ("[T]he decisionmaker's conclusion . . . must rest solely on the legal rules and evidence adduced at the hearing. To demonstrate compliance with this elementary requirement, the decisionmaker should state the reasons for his determination and indicate the evidence he relied on, though his statement need not amount to a full opinion or even formal findings of fact and conclusions of law." (citations omitted)).

Further, even if the existing written procedures allow a written appeal (with or without a hearing), they fail to notify applicants of: 1) the identify by name, position, or process of selection of the person who will consider and rule upon the appeal; 2) the standard of review that will be applied; or 3) what evidence will be considered on appeal and whether an applicant can supplement or amend their original application. If an appeal is offered, each applicant must subject to the same standard. Creating written

---

[5] Procedure 1.31 does not disclose who reviews and rules upon an application or what that person or persons consider beyond the four corners of the application.

policies will ensure that each applicant is treated the same. Otherwise, SDPD can apply different policies and procedures depending on whether the applicant is disfavored.

For all the reasons set forth above, Defendants failed to provide Plaintiff with adequate notice.

### 2. Lack of a Hearing

"The requirement of notice and an opportunity to be heard raises no impenetrable barrier to the taking of a person's possessions. But the fair process of decision-making that it guarantees works, by itself, to protect against arbitrary deprivation of property." *Fuentes v. Shevin*, 407 U.S. 67, 81 (1972). Thus, "[t]he right to a prior hearing has long been recognized by [the Supreme Court] under the Fourteenth and Fifth Amendments." *Id*. Yet despite the important First Amendment rights at risk here, Procedure 1.31 lacks any guarantee of a hearing before the SDPD revokes or denies a press pass. Once a journalist submits an application, SDPD reviews the application and informs the applicant whether it is approved or denied without a hearing or any other opportunity to be heard.

Procedure 1.31 contains a provision that allows a journalist to "request an appeal," but either intentionally or simply through sloppy drafting, it is not clear whether the Police Chief is required to provide an appeal when one is requested. Sperlein Decl. at Ex. E, Procedure 1.31 §§ IV (E) & VII (C). Since the procedures are unclear, we must rely on SDPD's actions to determine if an appeal is required when requested. When Plaintiff requested an appeal, her request went unanswered, so it appears the procedures do not require an appeal. *Id*. at ¶10, **Ex. E**. Even if the procedures contemplate a mandatory appeal process, that process does not include a hearing. SDPD Procedure 1.31 VII (C) states that, "[a] written decision regarding the appeal will be sent within ten business days…" *Id*. at **Ex. E**., Procedure 1.31 § VII (C).

Regrettably, evidence demonstrates that SDPD purposefully keeps the appeal process secret. In an e-mail from an unnamed official, SDPD told Plaintiff she would only be provided with details of the appeal procedures if she complied with demands to turn in her current press pass. *Id*. at ¶15, **Ex. I**. And when Plaintiff's counsel requested copies of "all written procedures for processing SDPD media identification cards" SDPD only returned a copy of Procedure 1.31. *Id*. at ¶12. If any procedures separate from Procedure 1.31 provide for a hearing, those procedures are akin to Animal House style double-secret-probation[6], which the First Amendment prohibits. *See Niemotko v. Maryland*, 340 U.S. 268, 272 (1951) (finding the lack of standards in a license-issuing "practice" renders that "practice a prior restraint in contravention of the Fourteenth Amendment).

### 3) Government's Interests.

It would not be difficult for SDPD to provide applicants with an opportunity for a hearing in cases in which it intends to deny an application for a press pass. *See Zinermon*, 494 U.S. at 127 (finding it would not be burdensome for a public utility to provide an opportunity for a meeting with customers prior to terminating service). Indeed, current procedures appear to contemplate some sort of review prior to a final determination, although the procedures are unclear and therefore elusive.

Records obtained through a public-records request suggest denials of applications for press passes are rare, so hearings would only be necessary in a limited number of cases and therefore would have a minimal impact on SDPD. Sperlein Decl. at ¶12.

### 4) Additional Considerations.

Further, the facts here demonstrate the need for more robust procedures because of SDPD's contempt for the limited procedures that are currently in place. The current written procedures are unclear but suggest that applications will be processed within

---

[6] https://www.youtube.com/watch?v=1tfK_3XK4CI

one week of being submitted and if denied, notice of the denial will be mailed within 10 business days of the denial.[7] Once procedures are put into place, due process requires that those procedures be followed. See *Vitarelli v. Seaton*, 359 U.S. 535, 545 (1959); *Clemente v. United States*, 568 F. Supp. 1150, 1168 (C.D. Cal. 1983)."Agencies must follow their own rules." *Hudick v. Wilkie*, 755 F. App'x 998, 1005 (Fed. Cir. 2018). However, SDPD did not notify Plaintiff of the denial until 49 days after she submitted her application, even though her counsel sent two communications reminding the Department that she was waiting for a decision. Sperlein Decl. at ¶¶ 6-9.

Further, although the procedures suggest a denial of an application can be appealed, SDPD ignored Plaintiff's request for an appeal. The first and only substantive response from the SDPD informed Ms. Knott that her appeal had been denied—without explaining the grounds of the alleged evidentiary insufficiency—and that her only remedy was to submit a new application. When her counsel requested an appeal of the denial, he received no response. *Id*. at ¶9 and **Ex. E**.

SDPD's failure to process Plaintiff's application within the time allowed in its procedures and its failure to comply with its own limited appeals procedures creates additional due process violations.

### B. Plaintiff's First Amendment Claim Is Likely to Succeed.

#### 1) Success Is Likely Irrespective of the Test Applied.

Plaintiff is likely to succeed on her First Amendment claim because SDPD cannot justify denying Plaintiff's application to renew her pass, and even if it could, SDPD's credentialing process confers unbridled discretion on those administering it.

---

[7] Sperlein Decl. **Ex. F**, Procedure 1.31, IV-J reads: "Applications are generally processed on Thursday, except when a holiday falls on a Thursday, the application will be processed the next business day."

Judicial opinions analyzing procedures for issuing or revoking press passes have addressed different kinds of press passes and have applied differing analysis. Some press passes are location specific. *Sherrill,* 569 F.2d at 129 (White House briefing room)*; Ateba v. Jean-Pierre,* 2023 U.S. Dist. LEXIS 217521 (D.D.C. Dec. 7, 2023) (same); *John K. MacIver Inst. for Pub. Policy, Inc. v. Evers*, 994 F.3d 602, 608 (7th Cir. 2021) (governor's conference room); *Alaska Landmine*, 514 F. Supp. 3d 1123 (statehouse press briefings). Another form of press pass—the form at issue here—is typically issued by law enforcement or local governments and allows journalists to cross police and/or fire lines, or other areas otherwise limited to the press. *See Stevens v. N.Y. Racing Asso.*, 665 F. Supp. 164 (E.D.N.Y. 1987); *Nicholas v. City of N.Y.*, No. 15-CV-9592 (JPO), 2017 U.S. Dist. LEXIS 26995 (S.D.N.Y. Feb. 27, 2017).

Reviewing governmental determinations regarding press passes, some courts have applied a public forum analysis. *TGP Communs.,* 2022 U.S. App. LEXIS 33641 at *9; *MacIver*, 994 F.3d at 610; *see also Alaska Landmine*, 514 F. Supp. 3d at 1130 (analyzing gubernatorial press conference under the three-step framework of the public-forum doctrine). Other courts have applied the unfettered discretion test usually associated with licensing schemes. *Quad-City Cmty. News Serv., Inc. v. Jebens*, 334 F. Supp. 8, 17 (S.D. Iowa 1971) ("Whatever standard Defendants employ to license journalists who are to be admitted to sites of newsworthy events must be narrowly drawn, reasonable and definite and they must be publicly available."). Still other courts have applied different non-specified First Amendment analyses. *See e.g., Stevens* at 176 ("In order to invalidate a content-neutral restriction on press access, plaintiff must demonstrate that the restriction does not serve a legitimate government objective or that the benefits derived from the restriction are fewer than the harm that it causes."); *Sherrill* 569 F.2d at 129 (noting that when a governmental actor makes decisions as to which reporters or press outlets get access to otherwise restricted areas, the First

Amendment "requires that access not be denied arbitrarily or for less than compelling reasons." (citing *Southeastern Promotions v. Conrad*, 420 U.S. 546 (1975))).

Regardless of the test applied, denial of Plaintiff's application violates Plaintiff's First Amendment rights.

### 2) The SDPD's Press Credentialing Process Violates the Unbridled Discretion Doctrine.

Whether the court views unbridled discretion through the lens of a prior restraint or as regulating access to a public forum, unbridled discretion is prohibited.

**Prior Restraint Analysis** - Under a prior restraint analysis, the Court must find SDPD Procedure 1.31 unconstitutional on its face. "[A] law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." *Arkansas Educ. Television Com'n v. Forbes*, 523 U.S. 666, 684 (1998) (*quoting Shuttlesworth v. Birmingham*, 394 U.S. 147, 150-151 (1969)).

In San Diego, a press pass allows journalists to enter locations necessary for news gathering and open to journalist under California law, thus withholding a pass creates a prior restraint. Sperlein Decl. at **Ex. E**, Procedure 1.31 § VI (C) ("When members of the media present valid media identification cards and have in their possession a blue Vehicle Identification Placard, they should be permitted to drive through police and/or fire lines."). Procedure 1.31 contains provisions that grant the Chief of Police unfettered discretion to grant or revoke a press pass. *Id*. at §§ IV (D)&(F) & V (B).

Specifically, the requirement that a media representative must demonstrate "a need to cross police and/or fire lines on a regular basis," with no objective criteria for determining "a need" or "regular basis" invites content-based, viewpoint-based, or speaker-based discrimination by failing to place meaningful restrictions on SDPD's

discretion. *Id*. The inherent subjectivity of the criterion allows SDPD to use it as pretext for denying an application. Accordingly, the requirement is unconstitutional on its face.

In addition, credentialing procedures impermissibly allow SDPD officials to deny a pass based on whether their actions would bring the SDPD or applicant "into disrepute." SDPD Procedure 1.31 (IV)(F) provides:

> Members of the Media in possession of a San Diego Police Department (SDPD) Press/Media pass shall conduct themselves with the same level of professionalism expected of all Department Members. 1. Documented behavior that would bring the Department or pass holder into disrepute may be grounds for denial or revocation of a media pass. As members of the media, they shall be expected to conduct themselves in accordance with the Society of Professional Journalist's (SPJ) Code of Ethics located at https://www.spj.org/pdf/spj-code-of-ethics.pdf.

This provision is entirely subjective and confers unbridled discretion with the Police Chief—who presumably is not an expert on journalistic ethics—to deny or revoke a media identification card and is therefore unconstitutional. In *TGP Communs.*, the Ninth Circuit granted an injunction pending appeal where local officials denied a press pass because the reporter was "not a reputable journalist under their press-pass guidelines and had reported false information about Arizona elections." *TGP Communs.,* 2022 U.S. App. LEXIS 33641 at *2. The Court granted the injunction because there was evidence that local officials based the denial of the press pass on Plaintiff's political viewpoint. The Court did not rule on Plaintiff's facial challenge, but the facts clearly demonstrate the chilling effect on news reporting that such a provision creates. *See also MacIver*, 994 F.3d at 614 ("First Amendment rights do not turn on, nor are they calibrated to, the quality of the reporting.") Unless explicit rules constrain their discretion, government officials are inherently susceptible to viewpoint discrimination.

Moreover, it is well established that when a license is required prior to engaging in speech, certain procedural guidelines must be met. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 223-24 (1990); *Baby Tam & Co. v. City of Las Vegas*, 154 F.3d 1097, 1101 (9th Cir. 1998) ("A decision to issue or deny a license must be made within a brief, specified and reasonably prompt period of time.") In *FW/PBS*, Justice O'Conner explained that the failure to place limitations on the time within which a determination is to be made on a license is "a species of unbridled discretion." *Id*. at 223; *see also, Real v. City of Long Beach*, 852 F.3d 929, 935 (9th Cir. 2017); *Yvon v. City of Oceanside*, 202 F. Supp. 3d 1147, 1158 (S.D. Cal. 2016); *Quad-City,* 334 F. Supp. at 17 ("[R]efusal to timely inform an applicant as to the reasons for denial of a pass, that is, in what respect(s) its application is found deficient according to the standards is as void of due process as is the lack of standards in the first instance.").

The Court in *FW/PBS* did not determine if the ordinance was content neutral and there was no allegation that the ordinance otherwise gave the government unbridled discretion. *Id*. at 223. The lack of a time constraint alone confers unbridled discretion.

**Public Forum Analysis -** Unlike the cases applying a public forum analysis where a press pass allowed access to a press briefing room, an SFPD press pass provides journalist access to emergency scenes and public protests occurring in locations that time immemorial have been considered public fora. "In places which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the State to limit expressive activity are sharply circumscribed." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). The State of California has legislated that public fora must remain open to the press even when emergency personal closes those areas to the general public. *See* Cal. Pen. Code §§ 409.5, 409.6, and 409.7. "[E]ven in limited public forums where the government opens a traditionally private place for speech on limited topics, such as opening the County facilities for

press conferences as the County did [in *TGP Communications*], the First Amendment's protections against content-based and viewpoint-based restrictions are robust. *TGP Communs.,* 2022 U.S. App. LEXIS 33641 at *10 (citing *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)).

"In these quintessential public forums, the government may not prohibit all communicative activity." *Id*. However, San Diego may enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication. *Perry* at 45. "[R]estrictions based on viewpoint are prohibited." *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009) (citing *Carey v. Brown*, 447 U.S. 455, 463 (1980)).

The Supreme Court has held that a licensing law is impermissible if it "gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." *Lakewood*, 486 U.S. at 759. "The Supreme Court has shaped the unbridled discretion doctrine with the prohibition on viewpoint discrimination in mind." *Kaahumanu*, 682 F.3d at 806. Because Defendants' procedures vest unbridled discretion with the Police Chief, the First Amendment requires that those provisions be treated as viewpoint discriminatory and thus prohibited by the First Amendment regardless of any other factor. *Lakewood*, 486 U.S. at 752 ("Even if the government may constitutionally impose content-neutral prohibitions on a particular manner of speech, it may not *condition* that speech on obtaining a license from an official in that official's boundless discretion." (emphasis in original)).

If the Court were to apply other First Amendment tests, the challenged procedures would nonetheless fail because once areas are open to access by journalist,

the First Amendment requires that that access "not be denied arbitrarily or for less than compelling reasons." *Sherrill*, 569 F.2d at 129.

### 3) Defendants Can Point to No Legitimate Reason for Denying Plaintiff a Press Pass.

If the regulations did not confer unbridled discretion thus rendering them content/viewpoint based, they would nonetheless have to meet standard time place and manner requirements, *i.e.* they must be narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication.

In California, local governments have no legitimate interest in preventing bona fide journalists from entering emergency locations and protest scenes, because California law prohibits such exclusion unless the location is a crime scene or "police personnel *at the scene* reasonably determine that such unrestricted access will interfere with emergency operations." *Leiserson*, 184 Cal. App. 3d at 51 (emphasis added).

If a journalist is excluded from an emergency scene, they have no other channel for gathering the information that is exclusive to the location. *TGP Communs.*, 2022 U.S. App. LEXIS 33641, at *15 ("[E]xclusion of the press from a forum cannot be rendered de minimis or otherwise mitigated by requiring Plaintiffs to avail themselves of a less desirable, even if somewhat effective, alternative.").

Regardless of which analysis the Court applies, Plaintiff can easily establish that Defendants have violated her First Amendment Rights by denying her a press pass.

### IV.    The Balance of Equities and Public Interest Lies with the Plaintiff.

SDPD will not be harmed if the Court issues the requested injunction. It will simply mean that during the pendency of this action, Plaintiff will be permitted to cross police lines—something SDPD has permitted her to do by issuing her press passes for over fifteen years and something California law entitles her to do. Moreover, the Ninth Circuit has broadly held that "it is always in the public interest to prevent the violation

of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012); *see also Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (noting that "the [district] court acknowledged the obvious [when issuing an injunction]: enforcement of an unconstitutional law is always contrary to the public interest" (collecting cases)).

The public benefits from journalists having maximum access to news events and retaining that access outweighs any government interests here. *TGP Communs.,* 2022 U.S. App. LEXIS 33641, at *17 (citing *Hernandez v. Sessions,* 872 F.3d 976, 996 (9th Cir. 2017) ("[T]he public interest is served by ensuring that the County's administration of press-pass credentials complies with the First Amendment.")).

"[T]he Supreme Court has repeatedly observed that excluding the media from public fora can have particularly deleterious effects on the public interest, given journalists' role as 'surrogates for the public,'" *Id.* (citing *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 572-73 (1980)).

> [I]n a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations. [...] With respect to judicial proceedings in particular, the function of the press serves to guarantee the fairness of trials and to bring to bear the beneficial effects of public scrutiny upon the administration of justice.

*Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 491-92 (1975) (citing *Sheppard* 384 U.S. at 350).

## V.    The Court Should Not Require a Bond.

Fed. R. Civ. Pro. 65(c) allows Courts to dispense with a bond. *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003); *see also* Reina Caldron, *Bond Requirements Under Federal Rule of Civil Procedure 65(c): An Emerging Equitable Exemption for Public Interest Litigants*, 13 B.C. Envtl. Aff. L. Rev. 125 (1985). In many circuits, including the Ninth, courts should not impose a bond when the party

seeking the injunction is advancing important constitutional or other federal rights. *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999). The Ninth Circuit also allows for waiving a bond when plaintiffs have a high likelihood of success on the merits. *Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1326 (9th Cir. 1985) (noting that "the likelihood of success on the merits, as found by the district court, tips in favor of a minimal bond or no bond at all"). The Court should waive a bond here.

## CONCLUSION

Defendants' denial of a media identification card to Plaintiff has caused and is continuing to cause Plaintiff irreparable harm. In the merits phase of this litigation Plaintiff is likely to demonstrate that the Defendants withholding of a media identification card was and remains unlawful. The public will benefit from Plaintiff having the enhanced access that is afforded to holders of media identification cards. Accordingly, the Court should grant Plaintiff's request for an injunction enjoining Defendants from continuing to deny Plaintiff's constitutional rights as set forth in the First and Fourteenth Amendments.

Respectfully submitted,

Dated: May 15, 2024

by: _____

_____
D. Gill Sperlein
THE LAW OFFICE OF D. GILL SPERLEIN

Harmeet K. Dhillon
Dhillon Law Group Inc.

Attorneys for Plaintiff Eva Knott